STATE, Respondent v. MURPHY, Appellant

(234 N.W.2d 54)

(File No. 11417. Opinion filed October 17, 1975)

Laurence J. Zastrow, Rapid City, for defendant and appellant.

William J. Janklow, Atty. Gen., Earl Mettler, Asst. Atty. Gen., Pierre, for plaintiff and respondent.

WINANS, Justice.

Dennis B. Murphy of rural Spearfish, South Dakota, was convicted by a jury at Rapid City on November 20, 1973, of distributing a controlled substance (marihuana) in violation of SDCL 39-17-88 on or about July 31, 1973. On January 10, 1974, he was sentenced to two years in the South Dakota State Penitentiary. From this conviction he appeals on a variety of grounds. He charges error in that

1) the statute under which he was convicted was not constitutionally reenacted;

2) the trial judge refused his motion for a court-appointed expert witness;

3) the trial court denied his motion for a directed verdict because of insufficient evidence and refused to declare a mistrial after a courtroom disruption;

4) the trial court gave several improper instructions;

5) the trial court allowed the state's key witness to rely too heavily on a written memorandum in refreshing her memory and it allowed her to testify on certain admissions where the speaker was not clearly identified; and finally

6) the trial court allowed the testimony of a chemist to be considered by the jury over several objections of defense counsel.

Upon consideration of each of Defendant's assignments of error we find that the trial court erred in allowing the testimony of Dr. Gaines concerning the results of the thin layer chromatogram without properly authenticating the standard he used. Nevertheless, in viewing all of the State's evidence we find that this error was not prejudicial and we affirm Appellant's conviction.

Naomi Ruth Church, a/k/a Cathy Clark, was in the employ of the State, paid by Pennington County, hired as a narcotics informant. She first met the Defendant in Spearfish, in late 1972. On July 30, 1973, Defendant and Paul Treick, not a party to this action, visited Church at her Rapid City apartment. At that time Treick arranged a marihuana sale. On the following day both Treick and Murphy returned to Church's apartment, Treick carrying a brown paper sack containing twelve baggies of marihuana. Church examined the bag's contents and gave Treick $50 for them. That afternoon Church turned the bag over to Deputy Richard Davis who transferred it to Dr. Jack Gaines, a chemist at the School of Mines and Technology. Church, Davis and Gaines were the State's three witnesses at the trial of Murphy the following November. At that time Treick had not yet been brought to trial.

▇ Defendant charges that the statute under which he was convicted was declared invalid in *State v. Matteson,* 1973, 87 S.D. 216, 205 N.W.2d 512, and that it had not been validly re-enacted at the time of the marihuana sale in question. Inasmuch as we have dealt with the same issue in *State v. Barr,* 1975, 89 S.D. 280, 232 N.W.2d 257, and have found that the State Drugs and Substances Control Act, SDCL 39-17-44 through 39-17-155, was validly reenacted when made part of our Code in 1972 and is not invalidated by SDCL 2-16-15 as Defendant contends, there is little merit in further discussion of the issue.

Murphy next argues that the trial court was in error in refusing his motion for a court-appointed expert witness to testify on the species of marihuana found in the twelve baggies. His reason for the motion is primarily that there are three separate and distinct species of marihuana and our state law prohibits the distribution of only one, cannabis Sativa L. If an expert were to give evidence supporting the three species theory and were also to find that Murphy's marihuana was marihuana of a species other than that specified in the statutes, Murphy would argue that the State had no case.

There is no question that under certain circumstances defendants who are without sufficient funds are entitled to more than court-appointed legal counsel in order to put on their case. SDCL 19-6-1 gives the court the authority where "issues arise upon which the court deems expert evidence is desirable" to "appoint one or more experts, not exceeding three on each issue, to testify at the trial." This court in *State v. Geelan*, 80 S.D. 135, 138, 120 N.W.2d 533, 535, has held that "This provision does not create an absolute right to the appointment of an expert witness. It merely permits the appointment of such witness in a proper case. Whether the appointment is made is committed to the discretion of the court." This Court is in sympathy with the American Bar Association's Standard for Criminal Justice where they provide that each appropriate local subdivision formulate a plan to include "investigatory, expert and other services necessary to an adequate defense." Providing Defense Services, § 1.5 Supporting Services. We also note that Rule 731 of the proposed final draft of the Uniform Rules of Criminal Procedure makes provision for the State's payment of reasonable expert witness fees for the defense. This Court in *Utsler v. State*, 1969, 84 S.D. 360, 171 N.W.2d 739, stated that "neither the federal nor state constitution mandate that an indigent defendant in addition to counsel is entitled at public expense to 'the full paraphernalia of defense', [citation omitted] or preparation for a claimed defense." We would not want these words ever to be so narrowly construed as to have them justify a denial of court-appointed expert witnesses where such are essential to adequate defense. This, however, is not the situation in the case before us. While the testimony of the proposed witnesses would undoubtedly have been interesting and informative it would have availed Defendant nothing.

SDCL 39-17-44(10) states:

" 'Marihuana' means all parts of any plant of the genus cannabis, whether growing or not; the seeds thereof; the resin extracted from any·part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin; but shall not include fiber produced from the mature stalks of such plant, or oil or cake made from the seeds of such plant."

This statutory definition is quite similar to the definition of marihuana provided in 21 U.S.C.A. § 802(15). In a recent case, *United States v. Walton,* 1975, D.C.Cir., 514 F.2d 201, the Court of Appeals for the District of Columbia Circuit was asked to decide a question similar to the one before us today with regard to the federal statute. Speaking for the Court, Chief Judge Bazelon said:

"* * * many rules of statutory cónstruction place the courts in an unco-operative position with regard to legislative intent. Judicial protection of significant statutory and constitutional interests at times require courts to demand a 'clear statement' of intent before deferring a legislative judgment. There always comes a point, however, where the legislative intent is as clear as is humanly possible and at that point the courts must either defer or exercise their constitutional responsibilities. While Congress with the wisdom of hindsight could have been more clear in its definition of marijuana, we can discover no significant doubt about Congress' purpose in proscribing the distribution of marijuana."

That Court held that "[t]he legislative history is absolutely clear that Congress meant to outlaw all plants popularly known as marijuana to the extent those plants possessed THC. Every federal appeals court which has considered the point has reached a similar conclusion." In spite of the clear federal statutory specification of cannabis Sativa L. alone as Marihuana Chief Judge Bazelon's court is of the conviction that the Congress meant to include other species, if such there be, as well. Even as Chief

Judge Bazelon laments the lack of clarity in the federal legislation, so we too regret our own state legislature's less-than-scientific specificity.* Nevertheless, it is clear to us that our own legislature thought that in denominating marihuana as "cannabis sativa L" it was including any marihuana capable of inducing the euphoric effect brought on by THC. To view the legislative intent otherwise would be to say that for no good reason, or no reason at all, our legislators were imposing severe penalties on those who trafficked in one type of marihuana because of the harmful effects it is thought to produce while at the same time permitting free commerce in other types of marihuana which induced identical or similar results.

■ Since we today hold that our statutory definition of marihuana must necessarily be broad enough to include any species of what is popularly known in the American community as "marihuana" to the extent that it contains THC, any testimony which Defendant's witnesses, however expert, may have given would have been superfluous. In denying Defendant's motion for court-appointed expert witnesses the trial court, therefore, in no way jeopardized Murphy's right to an adequate defense. It merely prevented the needless expenditure of the State's money on testimony which would neither have assisted the Defendant's case nor detracted from the State's. See *Cassady v. Wheeler*, 1974, Iowa, 224 N.W.2d 649.

■ We have reviewed the entire record and find evidence adequate to support the verdict. We also are in agreement that the trial court committed no error in denying Defendant's motion for a mistrial when the State's witness, Naomi Church, directed hostile remarks in the presence of the jury to a spectator apparently sketching her picture. The trial judge witnessed the outburst, concluded that it would not be detrimental to Defendant's case, admonished the jury and continued the trial. There is nothing in the record to indicate to us that Defendant was prejudiced by the witness' conduct nor has his counsel given us reason to believe this was so on appeal. The trial judge was in a far better position to evaluate the situation and, absent substan-

---

* The legislature has amended SDCL 39-17-44(10) by the enactment of Ch. 256, Laws of 1975, defining "marihuana".

tial reason to believe that he ought to have ruled otherwise, we cannot say that he was wrong.

We have also reviewed the challenged instructions to the jury and we find no reversible error in them.

During the course of her testimony at trial Naomi Church from time to time referred to a written record which she called her "report". Defendant objects to the use of the report on the grounds that the witness did more than refresh her memory with its use. Defendant claims that Church merely read the report to the jury. From the record we find this claim impossible to justify or substantiate. The witness testified that she needed the notes she made shortly after the transaction in question in order to refresh her memory. She had already testified as to the substance of the transaction and to the conversation that accompanied it. She used the notes or report and the evidence receipts to recall the exact words of a conversation and to pinpoint the time she delivered the purchase to the authorities. The lines between present memory refreshed by a memorandum, past recollection recorded in a memorandum and merely paraphrasing the memorandum of a past event are thin indeed. The trial judge allowed the witness to use her notes when she could not sufficiently recall the details of the transaction with precision. We have no reason to believe that her testimony subsequent to examining her notes was not that of a present memory of a past event refreshed by those notes. Even if, in some small part, it strayed from this traditionally acceptable zone we could not say that the trial court was guilty of reversible error in admitting it. Contrary to Defendant's contention, we also find that Church sufficiently identified Defendant as the Speaker in various conversations with him which she related on the stand and that in the context of her testimony there is no ambiguity in this regard prejudicial to Defendant.

Finally, Defendant raises several objections concerning the qualifications and the testimony of Dr. Jack Gains, the State's expert witness.

It was up to the trial judge to determine whether or not Dr. Gaines qualified as an expert witness. *State v. Parker,*

1973, 9 Wash.App. 970, 515 P.2d 1307. This the Court did and we find no abuse of discretion in that regard. Once the expert's qualifications had been established, any objections go not to the admissibility of his testimony but to its weight, all else being equal.

Dr. Gaines was free to testify as to the nature of the plants (marihuana) in question and to describe the process whereby he arrived at his conclusion. The jury was then at liberty to evaluate his testimony and arrive at its verdict. However, the trial court was in error in allowing that portion of Dr. Gaines' testimony which related to the thin layer chromatogram test.

Dr. Gaines testified that the standard used in conducting the thin layer chromatogram had never been tested by him against any known marihuana. He stated that his belief that the standard was marihuana was founded upon a remark made to him by Don Frasch, an assistant state chemist, that Dr. Van Bruggen, a botanist, had identified it as marihuana. The State produced no witness to identify the standard as marihuana. This thin layer chromatogram test involves an extract of a known sample of marihuana placed on a silica gel coated plate next to a sample of an extract of the substance to be identified. The plate is placed vertically in a solvent and the solvent moves up the plate by capillary action. It separates out various compounds in the extracts (of the identified and unidentified substances) on the plate and these compounds move up the plate at a certain rate depending on molecular weight. The location of these compounds from the unknown sample on the plate relative to the location of the compounds from the known sample is determinative in identifying the substance being examined. Informative in this regard is the witness' testimony:

> "Q. BY MR. ZASTROW: Then as I understand it you measure the distance these spots have traveled on a known—
>
> A. I don't even measure them. I just compare horizontally the relative position.
>
> Q. Isn't it a normal method of measuring from where the spot began to where each of the spots end?

A. This is a normal practice if you do not have a relative standard running alongside the known, yes. You must measure. This is called an RF value.

Q. You didn't determine an RF value?

A. This is not necessary, no.

Q. You do not feel in running your test that it is necessary to determine the RF value?

A. This is a much more reliable procedure to use a known standard and compare those two rather than determine—RF is dependent on environmental factors."

■ Because the thin layer chromatogram is a "side by side" test it is analogous to a comparison of handwriting samples. In a case dealing with handwriting samples the Tenth Circuit Court of Appeals said:

"It is, thus, manifest that the handwriting expert's opinion is based, in part, upon a comparison of signatures not proved to be genuine or admitted into evidence as such. The trial court's ruling admitting Wagner's 'purported' signature as a standard of comparison clearly indicates that the court misconceived the established rule governing authentication in cases of this kind. Not having been proved to be genuine, the signatures on the public documents were inadmissible as standards of comparison. In these circumstances the foundation for the expert's opinion cannot stand, and his opinion falls with it." *United States v. Wagner,* 1973, CA 10, 475 F.2d 121.

In similar fashion we are compelled to say that Dr. Gaines' identification of the questioned substance as marihuana by the thin layer chromatogram was based upon a standard sample not proved to be genuine or admitted into evidence. Since the standard was not properly authenticated his finding must be disallowed. Were this the only test employed by the doctor the State's case would fail. However, Dr. Gaines also employed other

testing procedures and concluded that the questioned substance was marihuana and the jury was entitled to weigh that testimony and find with him. Viewing the totality of the evidence, while disregarding the testimony relative to the thin layer chromatogram, we find that the jury could well have found Defendant Murphy guilty as charged.

We have reviewed the other assignments of error made by Defendant and have not found in them any reversible error.

Affirmed.

DUNN, C. J., and DOYLE, J., concur.

WOLLMAN and COLER, JJ., concur specially.

WOLLMAN, Justice (concurring specially).

I agree that the conviction should be affirmed. However, I do not agree that the trial court erred in allowing Dr. Gaines to testify about the thin layer chromatogram test. I am not sure from the record that defendant ever specifically called to the court's attention as a ground for the objection the claim that the alleged known sample of marihuana had never been properly authenticated. Moreover, after Dr. Gaines testified that he had obtained the standard sample of marihuana from Mr. Frasch, he was asked by defense counsel: "Now, have you examined that standard to determine in your own mind whether it is or is not a cannabis plant?," to which Dr. Gaines replied, "Yes, I have looked at it microscopically. I use it as my standard to compare to unknowns." I think that the only fair inference to be drawn from this testimony is that Dr. Gaines had satisfied himself that the standard sample did in fact consist of marijuana.

I would hold that the standard sample of marihuana was sufficiently authenticated as being marihuana to justify the trial court's overruling defendant's general objection of lack of proper foundation and lack of showing that the tests were reliable, just as this court held that the handwriting sample in question had been sufficiently identified in the case of *State v. Ballard*, 72 S.D. 293, 33 N.W.2d 339.

I am authorized to state that Justice COLER joins in this special concurrence.